# IN THE COURT OF APPEALS OF TENNESSEE
## AT JACKSON

| | | |
|---|---|---|
| SPECTRA PLASTICS, INC., and | ) | |
| J. GOODMAN ASSOCIATES, INC., | ) | |
| | ) | |
| Plaintiffs/Appellants, | ) Shelby Circuit No. 71878-9 T.D. | |
| | ) | |
| VS. | ) Appeal No. 02A01-9805-CV-00121 | |
| | ) | |
| NASHOBA BANK, | ) | |
| | ) | |
| Defendant/Appellee. | ) | |

**FILED**

July 26, 1999

Cecil Crowson, Jr.
Appellate Court Clerk

### APPEAL FROM THE CIRCUIT COURT OF SHELBY COUNTY
### AT MEMPHIS, TENNESSEE
### THE HONORABLE ROBERT L. CHILDERS, JUDGE

**JOHN E. TOMA, JR.**
**NEWMAN, FREYMAN & KLEIN, P.C.**
St. Louis, Missouri
**JERRY SCHATZ**
**MONYPENY, SIMPSON, WALKER & SCHATZ**
Memphis, Tennessee
Attorneys for Appellants


**LEO BEARMAN, JR.**
**EUGENE J. PODESTA, JR.**
**BAKER, DONELSON, BEARMAN & CALDWELL**
Memphis, Tennessee
Attorneys for Appellee

**AFFIRMED**

**ALAN E. HIGHERS, J.**

**CONCUR:**

**W. FRANK CRAWFORD, P.J., W.S.**

**DAVID R. FARMER, J.**

Spectra Plastics, Inc. ("Spectra") has appealed from the trial court's grant of

summary judgment to Nashoba Bank ("Nashoba") in this lender liability lawsuit. Based upon the following, we affirm the trial court's grant of summary judgment to Nashoba.

## I. Facts and Procedural History

This lender liability lawsuit against Nashoba was originally commenced on August 14, 1995 by Spectra, along with John E. Goodman, Sr., W. Cooper Sandusky, III, Donald G. Taylor, and Charles L. Cox, Jr., based upon Nashoba's alleged involvement in Spectra's collapse on February 17, 1995, at which time Spectra's business ceased operating. On October 10, 1995, Nashoba filed a motion to dismiss the individually named plaintiffs (Goodman, Sandusky, Taylor, and Cox), which was subsequently granted by the trial court -- subject to an allowance for the filing of an amended complaint within thirty days. Though such an amended complaint was thereafter filed by John E. Goodman, Sr., Mr. Goodman's claims were later dismissed without prejudice. On the same date that Mr. Goodman's claims were dismissed, "J. Goodman & Associates, Inc." ("JGA, Inc.") was "joined as a Party Plaintiff" and allowed to file a complaint. JGA, Inc.'s claims were then dismissed, however, on February 13, 1997. The dismissal of JGA, Inc.'s claims was not made to be a final judgment pursuant to Rule 54.02 at that time. Additionally, on February 13, 1997, Spectra was allowed to file an amended complaint. Spectra's complaint, as amended, separately set forth the following stated causes of action: breach of contract, breach of obligation of good faith and fair dealing, tortious interference with business expectancy, promissory misrepresentation, conversion, breach of fiduciary obligation, false pretenses, and fraudulent misrepresentation.

On August 8, 1997, Nashoba moved for summary judgment. In accordance with Rule 56.03 of the Tennessee Rules of Civil Procedure, Nashoba's motion was accompanied by a separate "statement of the material facts as to which [Nashoba] contends there is no genuine issue for trial." See TENN. R. CIV. P. 56.03. Thereafter, Spectra filed its response to Nashoba's statement of material facts. The following summary of facts (material or otherwise) "as to which . . . there is no genuine issue for

2

trial," stems from our review of these pleadings, and of the portions of testimony and/or other proof within the record cited in these pleadings.[1]

Nashoba is a Tennessee corporation that operates as a commercial bank, with its principal offices in Germantown, Tennessee. Spectra is a Mississippi corporation that was formed in July of 1992, and its original shareholders were Charles Cox, Don Taylor, and Howard Rudd, who each originally contributed $500.[2] Spectra was in the business of manufacturing injection molded plastic parts. It operated out of a leased facility in Arlington, Tennessee, and leased the equipment needed for its manufacturing process from Mitsubishi Corporation.

Nashoba and Spectra began dealing with each other in 1992, at which time Nashoba loaned Spectra $50,000 for the purpose of providing working capital for the startup business. On August 28, 1992, Spectra executed a $100,000 promissory note as a working capital line of credit. In July of 1993, Spectra was unable to meet its working capital needs from ongoing operations. In an effort to meet those working capital needs, John A. Goodman invested in Spectra, in the initial amount of $100,000, and became its principal shareholder and Chairman of its Board of Directors.

On or about August 24, 1993, Spectra and Nashoba agreed to increase Spectra's working capital line of credit at Nashoba to $300,000, and executed a promissory note (hereafter referred to as "Note 1392"), a copy of which was attached to Nashoba's statement of material facts, establishing the same.[3] Note 1392 provided that the principal

---

1. These "facts as to which . . . there is no genuine issue for trial" are based upon Nashoba's statement of material facts, combined with either Spectra's agreement that particular facts are undisputed (regardless of whether the agreement is only for the purpose of Nashoba's motion for summary judgment), or Spectra's failure to demonstrate that particular facts are disputed by appropriate citation to the record (assuming the facts, where disputed, were initially supported by Nashoba by appropriate citation to the record). See TENN. R. CIV. P. 56.03.

2. Additionally, Spectra's amended complaint explains that, "[a]t all times pertinent hereto, Cox and Taylor were stockholders, officers, and directors of Spectra."

3. Note 1392 sets forth, in pertinent part, the following:

"I" includes each borrower ....
"You means the lender ....
. . . .
PAYMENTS: I agree to pay this note as follows:

balance was due on demand, but, if no demand is made, then on August 23, 1994. The security agreement executed by Spectra in connection with Note 1392 provided, in part, that, for as long as any amount remained outstanding, Spectra would arrange to direct all payments due on accounts receivable to a post office box for deposit at Nashoba. This "lock box" arrangement that was agreed to had previously been explained to Spectra by written correspondence from Nashoba dated August 18, 1993, at which time Nashoba explained:

> We would set up a post office box to which your customers would remit. The only effect on them would be that payments to Spectra ... would be going to a different post office box. We have someone who goes by the Post Office twice a day to check for mail and brings it directly to the tellers who log them in a book, run the deposits into your account and fax you a copy of all items in the mail received. They also put the originals in the mail to you the same day.

During most of the time that Spectra was in business, it experienced cash flow difficulties as a result, at least in part, of undercapitalization and of production not living up to expectations. Spectra's income statements reflect that it continually experienced

---

Interest: I agree to pay accrued interest on demand, but if no demand is made monthly beginning September 23, 1993

Principal: I agree to pay the principal on demand, but if no demand is made than on August 23, 1994

. . . .

No modification of this agreement may be made without your express written consent. Time is of the essence in this agreement.

. . . .

SET-OFF: I agree that you may set off any amount due and payable under this note against any right I have to received money from you.

"Right to receive money from you" means:

(1) any deposit account balance I have with you;

. . . .

DEFAULT: I will be in default if any one or more of the following occur: (1) I fail to make a payment on time or in the amount due; ... (5) I ... become insolvent (either because my liabilities exceed my assets or I am unable to pay my debts as they become due); ... (7) I do or fail to do something which causes you to believe that you will have difficulty collecting the amount I owe you; ....

REMEDIES: If I am in default on this not you have, but are not limited to, the following remedies:

(1) You may demand immediate payment of all I owe you under this note (principal, accrued unpaid interest and other accrued charges).

(2) You may set off this debt against any right I have to the payment of money from you, subject to the terms of the "Set-Off" paragraph herein.

. . . .

(3) You may refuse to make advances to me or allow purchases on credit by me.

. . . .

By waiving your right to declare an event to be a default, you do not waive your right to later consider the event a default if it continues or happens again.

. . . .

WAIVER: I give up my rights to require you to do certain things. I will not require you to:

(1) demand payment of amounts due (presentment);

(2) obtain official certification of nonpayment (protest); or

(3) give notice that amounts due have not been paid (notice of dishonor).

4

significant monthly losses up through September, 1994, at which point Spectra's losses from operations totaled $662,248. Though Spectra finally experienced operating profits during the months of October and November of 1994 (collectively totaling $152,445), its total losses from operations at the end of these months was still $509,803, after which Spectra again began to experience monthly losses. After January 1995, Spectra's total losses from operations was again up to $617,053. Moreover, between August 1993 and January 1995, Spectra's net worth deteriorated from $76,785 to negative $300,286 (though a few incremental changes as viewed on a monthly basis were temporary increases in net worth). As of May 27, 1994, Spectra ceased paying compensation to Cox, Taylor, and Rudd, who were corporate officers, until such time as Spectra became profitable. As of May 30, 1994, Spectra was in arrears to Olsten Corporation in the amount of $81,107.48 for temporary personnel services. Over this period of time, Olsten was one of roughly 67 trade creditors that Spectra failed to pay timely. By April of 1994, Spectra was in default under the terms of its lease for its plant facility, and had requested a moratorium on rent payments due to its financial difficulties.

On August 23, 1994, Note 1392 became due and payable, though Spectra made no payment at that time. Later, however, on November 9, 1994, December 7, 1994, and February 7, 1995, Nashoba debited Spectra's checking account for the payment of accrued interest that remained unpaid by Spectra on Spectra's indebtedness to Nashoba.

In September of 1994, Spectra defaulted under the terms of its equipment leases with Mitsubishi. This default prompted MAC Funding Corporation (Mitsubishi's assignee as to Mitsubishi's rights under the leases) to notify Spectra that MAC was exercising its right to accelerate the entire balance due on seven equipment leases, which totaled $1,652,631.40 as of September 22, 1994.[4] For the quarters ending September 30, 1994 and December 31, 1994, Spectra was unable to pay its federal payroll tax liability when due. Moreover, by the end of the quarter ending March 31, 1995 (*after* Spectra ceased

_____

4. MAC Funding subsequently agreed to forbear the exercise of its rights, however, conditioned upon Spectra's ongoing cooperation in disclosing specified information to MAC Funding, and conditioned upon Spectra's future compliance with the terms of the leases.

business operations), Spectra's federal payroll tax liability totaled over $110,000.

On February 1, 1995, John E. Goodman, Chairman of the Board of Directors of Spectra, told D. W. McGaughey, President of Nashoba, that he expected that if Spectra could not collect on one particular customer account (Duracraft), then Spectra would be unable to continue business operations beyond February.[5] On February 2, 1995, Goodman again spoke with McGaughey, and similarly mentioned that, if Spectra could not collect from Duracraft, then he expected Spectra to file a bankruptcy petition shortly. At this time, Goodman also asked McGaughey if Nashoba would advance additional funds to cover Spectra's upcoming payroll, to which McGaughey declined. On February 15, 1995, Spectra failed to pay wages due its employees (*i.e.*, it failed to make its payroll).

During the first part of February, Nashoba's Board of Directors decided that any money that came into Spectra's checking account should be debited from the account and applied against Spectra's unpaid indebtedness from its line of credit. On February 15, 1995, this decision was communicated by McGaughey to Goodman (*i.e.*, Spectra). On February 16, 1995, a meeting took place between Spectra and Nashoba representatives. At this point, Spectra had just directly received two accounts receivable payment checks, which totaled $71,187.74, that had not been directly deposited into Spectra's account in accordance with the "lock box" provision of the parties' security agreement. At this meeting, Spectra representatives appealed to Nashoba to allow Spectra to deposit the funds and use the funds to meet payroll and other obligations. At the meeting's end, Nashoba's representatives agreed to revisit the issue with its Board of Directors (though there were "no guarantees" that Nashoba would reverse its prior decision), provided the funds were deposited.

On February 17, 1995, at approximately 12:00 noon, Cox delivered to the Nashoba Bank offices the checks for deposit and renewed his request that Spectra be allowed to

---

5. Goodman, however, further advised McGaughey that, in order to collect from Duracraft, which was dependant upon Spectra for its parts, he would threaten to terminate business dealings with Duracraft, and even threaten to perhaps shut down operations or file bankruptcy.

6

use the funds to pay other obligations. A response was requested by 2:00 p.m. Upon receipt of the funds (and Spectra's renewed request with its 2:00 p.m. "deadline"), McGaughey polled three of the four members of the executive committee to the Board of Directors,[6] which acted upon such loan issues in cases where, among other things, the full board could not be brought together. These three members, which included McGaughey, Charles Perkins, and William Watkins, decided to debit the funds on deposit and apply them to Spectra's past due indebtedness. As such, the funds were debited from Spectra's account and applied to the outstanding loan balance, at which point Spectra was promptly notified of Nashoba's decision. There still remains, however, an outstanding amount owed on Note 1392.

Aside from the above facts "as to which . . . there is no genuine issue for trial," the following *other* factual allegations are raised by Spectra's amended complaint (which *either* are not rebutted by Nashoba's "statement of material facts," along with the supportive proof therein cited, *or* remain genuinely disputed via contradicting proof within the record).

> At no time during 1993 or 1994 did Nashoba Bank voice any displeasure with or concerns about the manner in which Spectra was managing its business or its loans at Nashoba Bank.
> . . . .
> [B]ased upon the volume of purchase orders in hand, Spectra was projecting [a substantial increase in] sales volume ... and profits of $698,500.00 for the calendar year 1995. In the opinion of Cox, Taylor, Goodman and Sandusky, Spectra had "turned the corner" and was headed toward substantial and sustained profitability.
> . . . .
> In August, 1994 [(when Note 1392 matured)] ... the outstanding balance ... was $281,618.42.
> . . . .
> Thereafter, Cox and Taylor had both meetings and telephone conversations with their loan officer at Nashoba Bank, Ray Mullins. In addition, Goodman had a number of conversations with D. W. McGaughey, President of Nashoba Bank. At none of these meetings did any representative of Nashoba Bank indicate to Cox, Taylor, or Goodman that the Bank had any problems with the Spectra loans. Further, no representative of Nashoba Bank ever stated that Loan No. 1392 was in default.[7]
> . . . .
> [O]n October 13, 1994, ... McGaughey specifically stated: "Don't worry about it. Make the interest payments. What we want to do is to get you to a point

---

6. The fourth executive committee member was out of town.

7. Spectra had, however, received a notice from Nashoba shortly after Note 1392's maturity requesting payment in full, after which Cox contacted Ray Mullins, who was Nashoba's commercial loan officer responsible for handling Spectra's accounts. Mullins advised Cox that Spectra should continue to pay interest only on the outstanding balance of Note 1392, and that they would "*work on*" getting Loan No. 1392 renewed.

where we can convert it (Loan No. 1392) over to a term loan." Neither McGaughey nor Mullins indicated that Nashoba Bank had any problems with the Spectra loan and neither individual stated that this loan was in default.[8]

. . . .

However, unbeknownst to Goodman, Cox and Taylor, Nashoba Bank was concerned about its loans to Spectra. During 1993 and 1994, and specifically from and after August, 1994, at numerous board meetings and loan committee meetings, representatives of Nashoba Bank expressed concerns about the status of Spectra loans. The Board was specifically concerned about how Nashoba Bank was going to get out of the loans and how Spectra was going to pay off Loan No. 1392. Further, the Spectra loans appeared in late 1993 on a monthly "watch list" prepared by Nashoba Bank.[9] Notwithstanding these concerns, no one at Nashoba Bank expressed any problems or concerns with anyone at Spectra concerning Loan No. 1392 and the other Spectra loans.

. . . .

Throughout November and December, 1994 and January, 1995, ... no representatives of Nashoba Bank ever stated that Loan No. 1392 was in default or ever made any demand for payment on such loan.[10]

. . . .

[O]n February 14, 1995, [(after Nashoba had debited Spectra's account for the payment of unpaid accrued interest without notice to Spectra following Spectra's deposit of funds into the previously overdrawn account)] Taylor, Cox, and Goodman met with D. W. McGaughey .... Goodman told McGaughey that he wanted to know how the Bank would treat future deposits in Spectra's account. Taylor, Cox, and Goodman wanted McGaughey's assurances that Spectra would be able to use any funds deposited in Nashoba Bank, and that the Bank would not continue to "debit" the account without Spectra's knowledge.

. . . .

McGaughey did not provide a clear answer. He stated that he believed Nashoba Bank was still willing to work with Spectra, but that the accounts receivable loan would probably need to be converted into an installment loan and that he needed a plan whereby Spectra would begin to pay down its accounts receivable line.

. . . .

Goodman told McGaughey that he would be meeting with Duracraft on February 15, 1995 and that he expected to receive payments in excess of $70,000 from Duracraft and Sunbeam within the next couple of days. However, Taylor, Cox, and Goodman told McGaughey that these funds would be needed first to pay ... 19 checks previously dishonored by Nashoba Bank, to make the February 15, 1995 payroll, and to pay certain outstanding utility bills. They told McGaughey that after these payments, Spectra would have approximately $10,000 to apply against Loan No. 1392. McGaughey said he would present Spectra's proposal to Nashoba Bank's Board of Directors the following morning.

. . . .

On February 15 and 16, 1995, Spectra received checks ... totaling $71,187.74. However, [as mentioned earlier] on February 15, 1996, McGaughey also informed Goodman that the Board had instructed him to

---

8. But cf. note 7 *supra*.

9. Spectra had been regularly listed on this internal monthly "watch list" beginning December, 1993. This "watch list," which listed numerous other accounts or loans aside from Spectra's indebtedness, provided an estimation of the amount that the bank would lose if Spectra's account was "liquidated" (*i.e.*, it listed the extent to which Spectra's indebtedness was not secured by accounts receivable or some other form of collateral). In December 1993, this loss estimation was $18,900. By November, 1994, this loss estimation had increased to $62,400.

10. But cf. note 7 *supra*.

apply any funds deposited in Spectra's account to pay down the accounts receivable loan.

. . . .

[A] meeting was scheduled for 3:00 p.m. on February 16, 1994.

. . . .

Cox, Taylor and McPherson attended the meeting on behalf of Spectra. McGaughey and ... Doug Scott attended the meeting on behalf of Nashoba Bank. .... Cox and Taylor explained to Scott and McGaughey that failure to make payroll would doom the company. .... Despite repeated requests by Cox and Taylor that Nashoba Bank commit to [Spectra's] proposed use of these funds, Nashoba Bank refused to issue such a commitment.

. . . .

McGaughey ... stated that Nashoba Bank was willing to continue to work with Spectra, provided that Spectra was willing to make a show of "good faith." McGaughey explicitly stated that Spectra's deposit of the $71,187.74 in its Nashoba Bank account would constitute such an act of "good faith." McGaughey told the Spectra representatives that he would "favorably recommend" these proposals to the Board of Directors if and after Spectra deposited the $71,187.74 in its Nashoba Bank account.

. . . .

The meeting was ... joined by Charlie Perkins, an attorney and member of the board of directors of Nashoba Bank. .... Perkins stated that although he could "make no assurances," he would also recommend Spectra's proposal to the Board of Directors. However, Perkins also made it clear that Spectra's failure to deposit the $71,187.74 in its Nashoba Bank account would result in the immediate termination of Nashoba Bank's working relationship with Spectra. Further, Perkins reiterated ... that Nashoba Bank needed a show of "good faith" from Spectra and that the Bank would consider the deposit of the $71,187.74 to be such a show of "good faith."

. . . .

During the meeting, Doug Scott, who had been introduced to the Spectra representatives as the new loan manager over the Spectra loans, stated that the $71,187.74 was the property of Nashoba Bank. Scott stated repeatedly that Spectra's failure to deposit the funds would constitute a breach of Spectra's loan covenants with Nashoba Bank.

. . . .

After the meeting, Cox, Taylor, and Goodman decided that Spectra had no choice but to deposit the funds in its Nashoba Bank account. In reaching this conclusion, these individuals specifically relied upon Perkins' and McGaughey's statement that they would take Spectra's proposal to the Board of Directors and favorably recommend such proposal. .... Accordingly, ... on February 17,1995, Spectra delivered checks totaling $71,187.74 to Nashoba Bank.

. . . .

After depositing the funds ... the Bank ... debited Spectra's checking account in the amount of $70,934.49, and ... applied these funds against Loan No. 1392. Cox and Taylor also learned that Nashoba Bank was making demand for the balance due under this loan.

. . . .

As a result of Nashoba Bank's debiting Spectra's account and applying $70,934.49 to the accounts receivable loan, Spectra was unable to make its payroll on February 17, 1995. .... Spectra's inability to make this payroll resulted in the immediate destruction of the Company. On February 17, 1995, at 7:00 p.m., Spectra was forced to cease operations and close its doors.

On February 6, 1998, the trial court granted Nashoba's motion for summary

9

judgment.[11]  On February 25, 1998, Spectra filed a motion to alter or amend, which was denied by the trial court on April 3, 1998.  Thereafter, on April 22, 1998, Spectra filed a Notice of Appeal.

On appeal, Spectra asserts that the trial court erred in its grant of summary judgment to Nashoba as to Spectra's misrepresentation and contract claims.  Spectra has not asserted any error to the extent that summary judgment was granted as to Spectra's claims regarding "tortious interference with business expectancy," conversion, and "breach of fiduciary obligation."

## II.  Analysis

## J. Goodman & Associates, Inc.'s Claims

Before reviewing the trial court's summary judgment ruling as to Spectra's claims, we find it necessary to address one preliminary matter.  The "appellant(s)" brief that was submitted to this Court in this case was titled "Brief of Plaintiffs/Appellants Spectra Plastics, Inc. *and J. Goodman Associates, Inc.*"  Moreover, this brief sets forth in its statement of issues the following:

> Did the trial court err in granting Defendant Nashoba's Motion to Dismiss the claim of Plaintiff JGA where JGA set forth in its Complaint allegations that Nashoba affirmatively misrepresented the true status of its banking relationship with Spectra in order to induce JGA to loan or otherwise invest funds in Spectra?

Neither this issue nor the party raising this issue (JGA, Inc.), however, is properly before this Court.  Rule 3(f) of the Tennessee Rules of Appellate Procedure expressly requires, "The notice of appeal shall specify the party or parties taking the appeal . . . ."  TENN. R. APP. P. 3(f).  This requirement accords with the purpose of the notice of appeal, which "is simply to declare in a formal way an intention to appeal."  TENN. R. APP. P. 3 advisory comm'n comments.  The only notice of appeal that was filed in this case, however,

---

11. The trial court's order that granted summary judgment to Nashoba further denied a motion for partial summary judgment that had been filed by Spectra.  This motion for partial summary judgment, which had been filed on July 14, 1997, was limited to the issue of liability on some of Spectra's claims. Spectra, however, has not raised any issue on appeal as to the trial court's denial of its motion for partial summary judgment.

10

expressly specified Spectra as an appealing party, and did not declare JGA, Inc.'s intention to appeal in any manner.[12]  Accordingly, review of the trial court's dismissal of JGA, Inc.'s claims is not properly before this Court, and we will hereafter address only those issues relating to Spectra's claims.  Cf. State v. City of Murfreesboro, No. 01-A-01-9404-CH00195, 1994 WL 585678 at *2 (Tenn. App. Oct. 26, 1994) ("there is no provision [in the Tennessee Rules of Appellate Procedure] permitting one of two plaintiffs who join their separate suits in a single action to appeal the dismissal of both suits without the joinder of both plaintiffs in the notice of appeal and appeal bond").

## Spectra's Misrepresentation Claims

Spectra has asserted on appeal that the trial court erred in granting Nashoba's motion for summary judgment as to Spectra's misrepresentation claims.  Specifically, Spectra alleges that Nashoba, through its representatives:  (1) misrepresented and/or failed to disclose the status of its banking relationship with Spectra; (2) misrepresented an intent to forbear collection of Spectra's loans; and (3) misrepresented its intent with regard to the funds that were deposited on February 17, 1995.

As this Court explained in Axline v. Kutner, 863 S.W.2d 421 (Tenn. App. 1993), an action for fraudulent misrepresentation contains four elements:

> (1) an intentional misrepresentation of material fact, (2) knowledge of the representation's falsity, and (3) an injury caused by reasonable reliance on the representation.  The fourth element requires that the misrepresentation involve a past or existing fact or, in the case of promissory fraud, that it involve a promise of future action with no present intent to perform. Nondisclosure will give rise to a claim for fraud when the defendant has a duty to disclose and when the matters not disclosed are material.

Id. at 423 (citations omitted) (quoting Dobbs v. Guenther, 846 S.W.2d 270 (Tenn. App. 1992)).

Initially, we find no merit in Spectra's first asserted instance of misrepresentation --

---

12. Similarly, the motion to amend that extended the time within which Spectra was required to file its notice of appeal was expressly filed only by Spectra.

that Nashoba misrepresented or failed to disclose its banking relationship with Spectra. First, we note that Spectra's brief suggests that "Nashoba breached its duty to inform Spectra that the bank considered Loan No. 1392 to be in default from and after August 23, 1994." We reject Spectra's suggestion that any such duty existed, as Note 1392 was, by its own express terms, "in default," regardless of whether Nashoba expressed its view on the status of Note 1392. Second, Spectra's brief suggests that Nashoba had failed to inform Spectra that it had kept Spectra's loans listed on a "watch list," and failed "to inform Spectra that [Nashoba's] Board of Directors had soured on the banking relationship." The facts before us, however, indicate clearly that both Spectra and Nashoba were acutely aware of Spectra's significantly distressed financial condition. As to the time period relevant to Spectra's collapse, Nashoba appropriately states in its brief:

> When a company owes a bank over $281,000; when that company cannot pay its vendors, landlord, equipment suppliers, employees, or tax collectors; and when that company states to its bankers that its doors [may] close ... and that a bankruptcy petition [may be] forthcoming, that company's officers know, or reasonably should know, that its banker will be concerned.

Therefore, we reject Spectra's suggestion that Nashoba "failed to inform Spectra" of such matters. Third, aside from Spectra's contentions that Nashoba breached a duty to disclose in these regards, Spectra further asserts that Nashoba affirmatively misrepresented the status of the parties' banking relationship. We similarly reject any such claim, however, because an essential element in any case of misrepresentation is justifiable or reasonable reliance. Speaker v. Cates, 879 S.W.2d 811 (Tenn. 1994). The facts before us convince us that no reasonable factfinder could find that Spectra justifiably relied on any earlier statements by Nashoba concerning the "status" of the parties' banking "relationship." As we have stated, both Spectra and Nashoba were acutely aware of Spectra's significantly distressed and deteriorated financial condition, and, while the facts suggest that Spectra might have actually known that Nashoba was concerned about Spectra's financial condition, Spectra's officers at least reasonably should have known that Nashoba was concerned. Accordingly, there exists no *genuine* issue of material fact for submission to the fact-finder as to these matters.

As mentioned above, Spectra also asserts that Nashoba misrepresented an intent

12

to forbear collection on Spectra's indebtedness. This is based upon Nashoba's statement that Spectra should not "worry" about paying off the full amount of its debt to Nashoba. This statement, however, was made at a time when the full amount of the note *first became due*, at which point the statement was qualified upon the premise that Spectra would continue to pay monthly interest, and upon the premise that the outstanding principal would be converted over to an acceptable term loan, whereby the outstanding principal would begin to be paid off. Spectra, however, failed to pay its monthly interest over the following several months -- causing Nashoba to debit Spectra's account in November 1994, December 1994, and February 1995. Moreover, no agreement as to an acceptable term loan was ever reached between the parties during this time. As such, no reasonable factfinder could conclude that Nashoba's original statement (for Spectra not to "worry"), as construed *as of the time the statement was made*, was an intentional misrepresentation of a material fact upon which Spectra ultimately justifiably relied. See Axline, 863 S.W.2d at 423. Furthermore, we find it significant that Note 1392 contains a "no oral modification" clause which provides that Note 1392 cannot be modified unless Nashoba gives its written consent to such modification.

As to Spectra's claim of misrepresentation regarding the February 17 deposit, we find this claim to be without merit. By the express terms of the parties' contract, Spectra had a contractual obligation to deposit those funds with Nashoba.

> It is said to be immaterial that one is induced by false representations to do what he is bound to do. A person who has been induced to do that which the law would have otherwise required him to do cannot claim to have been defrauded. In other words, one suffers no damage where he is fraudulently induced to do something which he is under legal obligation to do, such as pay a just debt ... or perform a valid contract.

37 AM. JUR. 2d, *Fraud and Deceit* § 295 (1968). Moreover, Nashoba had a contractual right to use the February 17 deposit funds as a set-off against the debt owed to Nashoba by Spectra. Accordingly, we find that the trial court correctly granted summary judgment in favor of Nashoba on this issue, as well.

**Spectra's Contract Claims**

13

Spectra asserts three claims relating to the parties' contracts. First, Spectra contends that Nashoba waived its right to demand payment on Note 1392 through course of conduct. Second, Spectra contends that Nashoba violated Tennessee Code Annotated section 47-1-203's obligation of good faith in the performance and enforcement of contract.[13] Third, Spectra contends that Nashoba violated a common law duty of good faith.

As to Spectra's first argument, Note 1392 establishes that any waiver by Nashoba of its right to declare an event to be a default does not waive its right "to later consider the event as a default if it continues or happens again." Furthermore, Note 1392 establishes that Spectra waived its right to notice and demand for payment. As such (and contrary to Spectra's assertion), Nashoba did not waive its right to demand payment or to set off Spectra's debt without first providing notice. We note that our conclusion is consistent with Tennessee Code Annotated section 47-50-112(c), which provides, "If any . . . note . . . or other contract contains a provision to the effect that no waiver of any terms or provisions thereof shall be valid unless such waiver is in writing, *no court shall give effect to any such waiver unless it is in writing.*" Tenn. Code Ann. § 47-50-112(c) (1995) (emphasis added). Although Note 1392 does not contain a provision to this precise effect, Note 1392 does provide that the terms of the note cannot be *modified* except in writing.[14] Accordingly, we conclude that Note 1392's "no oral modification" clause should be given effect according to the parties' express agreement, and find that Nashoba had the right to enforce the past due obligation of Spectra.

As stated above, Spectra also asserts that Nashoba violated Tennessee Code Annotated section 47-1-203, which imposes an obligation of good faith and fair dealing upon parties in the performance or enforcement of contracts. See Tenn. Code Ann. § 47-1-203 (1996). The official comments to this statute, however, explain that this statute

---

13. Spectra also attempts to rely upon Tenn. Code Ann. section 47-1-208 for its assertion that Nashoba violated its statutory obligations. We summarily reject Spectra's reliance upon this statute, however, because it is inapposite to the facts and circumstances of this case, as it applies to acceleration provisions and there was no acceleration of the debt in this case.

14. See *supra* note 3.

"does not support an independent cause of action for failure to perform or enforce in good faith." Id.

The Tennessee Supreme Court has recently discussed at length and expounded upon the obligation of good faith with respect to contracts in the case of Wallace v. National Bank of Commerce, 938 S.W.2d 684 (Tenn. 1996). In Wallace, the Court quoted from the case of TSC Industries, Inc. v. Tomlin, 743 S.W.2d 169, 173 (Tenn. App. 1987), in summarizing the law of good faith as follows:

> "It is true that there is implied in every contract a duty of good faith and fair dealing in its performance and enforcement, and a person is presumed to know the law. What this duty consists of, however, depends upon the individual contract in each case. In construing contracts, courts look to the language of the instrument and the intention of the parties, and impose a construction which is fair and reasonable."

Id. at 686 (citation omitted). The Wallace court cited with approval the case of Bank of Crockett v. Cullipher, 752 S.W.2d 84, 91 (Tenn. App. 1988) for the proposition that "good faith in performance is measured by the terms of the contract." Id. In Wallace, the court held that because the language in the contract at issue clearly allowed the defendant bank's actions, there was no bad faith on the part of the defendant bank as it performed the contract according to its terms. Id. at 687. Similarly, in the case at bar, the contract between Spectra and Nashoba clearly states and reflects the intent of the parties. Due to the express agreement between the parties, Spectra could expect that, at some point, Nashoba would demand payment and/or exercise its set-off rights as it had done in the past. Pursuant to the authority of Wallace, "Performance of a contract according to its terms cannot be characterized as bad faith." Id. at 687. Nashoba had every right under the terms of its clear and unambiguous loan documents with Spectra to attempt to collect on the debt owed to it by Spectra by deducting the amounts owed to it from Spectra's account without providing prior notice to Spectra.

### III. Conclusion

Based upon the foregoing, the judgment of the trial court is hereby affirmed. Costs

on appeal are taxed to Spectra for which execution may issue, if necessary.

 

HIGHERS, J.

CONCUR:

CRAWFORD, P.J., W.S.

FARMER, J.