

# In the
# Court of Appeals
# Second Appellate District of Texas
# at Fort Worth

---

No. 02-23-00494-CV

---

VIRGINIA MORMAN, Appellant

V.

BISHOP ENERGY D/B/A ENDERBY GAS, Appellee

---

On Appeal from the 235th District Court
Cooke County, Texas
Trial Court No. CV23-00198

---

Before Sudderth, C.J.; Kerr and Walker, JJ.
Memorandum Opinion by Chief Justice Sudderth

## MEMORANDUM OPINION

## I. Introduction

"No-answer" default judgments are disfavored under Texas law, and they have been for a long time. *See In re Lakeside Resort JV, LLC*, 689 S.W.3d 916, 920 (Tex. 2024) (orig. proceeding); *Craddock v. Sunshine Bus Lines, Inc.*, 133 S.W.2d 124, 126 (Tex. [Comm'n Op.] 1939); *see also Primate Constr., Inc. v. Silver*, 884 S.W.2d 151, 152 (Tex. 1994) ("For well over a century, this court has required that strict compliance with the rules for service of citation affirmatively appear on the record in order for a default judgment to withstand direct attack."). As the supreme court recently explained,

> Default judgments differ from every other kind in a fundamental way: the losing party is wholly absent. Other types of orders and judgments result from litigation in which both sides are present, contribute to the creation of a record, and engage in the adversarial clash that refines their arguments and identifies their opponent's errors and weaknesses. This clash likewise allows both sides to alert the court to perceived judicial errors. In theory, this collision of evidence and ideas increases the likelihood that accurate and truthful results will emerge from the judicial process. Correspondingly, courts have multiple causes for concern when only one side is present. Courts should worry about the inherent unfairness to the missing party, of course, but also about the threat to judicial integrity and independence that comes from the heightened risk of pronouncing and then enforcing erroneous judgments, backed by the coercive power of the State.
>
> . . . .
>
> Our law thus greatly disfavors but cannot wholly disavow default judgments. They are tolerable only because the absent party could have appeared but chose not to do so. . . .
>
> The problem, of course, is that an absent defendant often has not actually chosen to abandon its right to defend itself. For one reason or

2

another, sometimes justifiable and other times negligent or worse, a defendant may be unaware of pending litigation even when a plaintiff's efforts to provide notice technically comply with (or even exceed) what the law requires.

*Lakeside Resort JV, LLC*, 689 S.W.3d at 920–21. Any doubts about a default judgment must be resolved against the party who secured the default. *Id.* at 922. Because the record in the appeal before us reflects such doubts, we reverse the trial court's judgment.

## II. Background

Appellee Bishop Energy d/b/a Enderby Gas sued 85-year-old Appellant Virginia Morman,[1] individually, along with M Propane, LLC and Virginia's grandson, Zachary Aaron Morman, individually, for $281,330.08 based on an unpaid invoice.

### A. Motion for substituted service

Bishop Energy filed a motion for substituted service in which its process server, Joseph Reeves, listed his unsuccessful attempts on June 23, 2023, to serve M Propane and Virginia.

Reeves recounted that, on that day, at 1:18 p.m., he stopped at a home with "Mormans" on the mailbox and spoke with an adult female, who confirmed that she was Zachary's spouse and that Virginia lived "up the road." At 1:25 p.m., Reeves spoke in the front yard of Virginia's home with "an elderly adult male wearing hearing

---

[1]This case involves references to and testimony by people with the same last name. We will refer to these individuals by their first names to avoid confusion.

aids in both ears," identified later as Virginia's husband, Charles. Charles confirmed that Virginia lived there, but he did not allow Reeves to speak with her. Reeves stated,

> [Charles] informed me that she denies having anything to do with the subject propane business, and stated she will not meet with me, speak to me, or accept the papers addressed to her. He was polite and respectful during our conversation, but adamant that I would have no contact with defendant Virginia Morman.

At 2:05 p.m., Reeves saw Charles drop off trash in the large commercial dumpster at the rear of M Propane's business address and noted, "Door hanger with my contact information attached to the business main entrance glass door with tape."

At 3:30 p.m., Reeves noticed that his door hanger was no longer on the front door and that the overhead side bay door was open with a Jeep Wrangler inside that was registered to Zachary. He spoke with a young adult male, who let him in but who did not match Zachary's appearance from social media photos and who denied being Zachary. The young man informed Reeves that he had sent the door hanger information to Zachary.

The trial court granted Bishop Energy's motion, allowing the citation, with the petition and the substituted-service order attached, to be served by affixing it to the "most prominent door/gate" of Virginia's home address or M Propane's business address. Reeves chose the latter option.

4

## B. No-answer default judgment and motion for new trial

On September 19, 2023, the trial court heard Bishop Energy's motion for default judgment and granted it after the presentation of evidence on the unpaid invoice and its attorney's fees. The default judgment—against all defendants, jointly and severally—awarded to Bishop Energy its requested $281,330.08, as well as $5,000 in attorney's fees, $780.79 in costs, and conditional attorney's fees for subsequent proceedings.

Two weeks later, Virginia filed a motion for new trial. In her motion, Virginia asserted that she did not frequent M Propane's address, had "practically no contact with M Propane or any of its operations," and had no regular contact with Zachary. She stated that she was in her eighties, that she had "very little experience with legal matters," and that "[w]hen she finally received the citation and attachments, she did not know what they were" and did not understand their meaning. Virginia stated that she "never realized that she needed to file an answer to this lawsuit, and she never knew about the setting of the hearing on the default judgment."

As a meritorious defense, Virginia further stated that she and Charles had transferred full ownership and operation of M Propane in 2012 or 2013 to their son, Charles Lance Morman,[2] now deceased, and that Lance had left M Propane's ownership to Zachary in his estate. Virginia asserted that her failure to answer the

---

[2]Because Charles Lance Morman shares his father's first name, we will refer to him as Lance to avoid confusion.

lawsuit or to appear in court "was due to her age and lack of understanding of legal process" and not the result of negligence, conscious indifference, or disregard of the need to respond. She further asserted that setting aside the default judgment would not work a hardship or prejudice on any party.

Virginia supported her motion with an unsworn declaration in which she stated,

> It was never my intention to ignore the lawsuit or the requirements for responding to it and appearing in Court. I did not understand that a lawsuit had been filed. The lawsuit papers were not delivered to my home address. Instead, it is my understanding that they were delivered to the business address of the company. This is an address to which I would not have been going on any regular basis. Thus, I did not understand that I could be subject to the lawsuit until a copy of the final judgment was delivered to me on or about September 20th or 21st, 2023. After reviewing that with family members, including my husband, my daughter, and my son-in-law, we reached out to an attorney with whom my daughter and son-in-law were familiar . . . . Only then did I begin to understand what had happened.

## C. Hearing on Virginia's motion for new trial

On December 1, 2023, the trial court heard Virginia's motion. Charles testified that he knew nothing about the lawsuit before receiving the letter that stated they were being sued for over $300,000 and that it "blowed [his] mind when he got it." He stated that he usually opened their mail and then Virginia would read it. Charles could not recall when they received the letter.

Charles recalled Reeves's visit to their home but did not recall the process server's name. He stated that Reeves had brought a notebook computer for Virginia

6

to sign and did not have any papers with him. Charles testified that he told Reeves that Virginia would not sign it, adding, "The guy was nice. He wasn't abusive, or anything like that. But I didn't know what it was, I'm not going to sign anybody's paper like that -- come up -- I didn't know what it was." Charles explained that it was normally his and Virginia's practice not to sign anything that they did not understand. He stated that he told Reeves that "she wasn't going to sign it, we wasn't going to sign nothing."

Charles further testified that, since 2014, he and Virginia had had nothing to do with M Propane and that, in 2021, after Lance died, Lance's son Zachary took over the business.

On cross-examination, Charles testified that Zachary lived down the road from him and Virginia. He agreed that he had told Reeves that Virginia had nothing to do with the business and that she had been home when he spoke with Reeves, and although he initially did not recall telling Reeves that she would not speak with him, he stated, "I guess so," when asked, "[Y]ou told [Reeves] that your wife Virginia[] would not meet with him or speak with him; is that true?" Charles did not recall telling Reeves that Virginia would not accept any papers addressed to her. When asked, he agreed that later that day he "may have went down [to M Propane's business location] to dump trash" in the garbage dumpster.

On redirect, Charles stated that when he went down to M Propane's business location, "[a] lot of times [he] get[s] out and walk[s] around down there a little bit . . .

[and] talk[s] to the boys from time to time," but on that day, to the extent he recalled, he just went to dump trash. The trial court asked Charles how far the business address was from his and Virginia's home, and Charles replied, "probably about three miles."

Virginia, who was 86 years old at the time of the hearing, testified that she did not know when she first learned that she had been sued, stating, "I'll be honest with you, I don't know. It seemed like it was . . . a couple months ago, I don't know. I'll be honest with you, I don't." She stated that she thought her first knowledge of the lawsuit occurred when she received the clerk's letter in the mail about the trial court's judgment, "maybe in September." Virginia stated that when she received it, she "called [her] daughter immediately[,] so she might -- could tell you."

Virginia stated that after she and Charles retired and turned the business over to Lance, Lance continued to operate the business from the same location, but she no longer had a reason to go there. Since 2014, she had been there only once to deliver some food to their grandson who was working in the office. Virginia stated that if someone had left papers giving notice of the lawsuit at that location, she would not have received them.

Virginia testified that Lance and Zachary worked in the business until Lance died and that she did not have much contact with Zachary. As to Zachary, Virginia stated, "I saw him one time in June when they come over to swim. And he was there two or three hours, and I haven't seen him -- I haven't talked to him since then."

8

Virginia stated that Zachary had drug problems, which were unacceptable to her and Charles, so they would not have had any occasion to talk to him about the lawsuit or any money owed to Bishop Energy. Virginia further stated, "[W]hen we worked there, I paid [Bishop Energy] every time on time. I was never late with a payment, as far as I recall." Zachary's 18-year-old son—Virginia's great grandson—worked in the business with Zachary, but she did not see him much.

Virginia gave the following testimony about Reeves's visit on June 23, 2023:

> Q. Okay. And did -- when did your husband – did you see the man out in the yard?
>
> A. No, sir, I was in the kitchen. No, sir.
>
> Q. Okay. Did you talk to your husband about it before the man arrived, did you talk to him about a lawsuit?
>
> A. No, sir.
>
> Q. When your husband came in, did he tell you that a man had -- he talked to a man, and the man was trying to serve you with something?
>
> A. I don't think so. I don't recall, I really don't. I don't think I even mentioned it to him, I mean --
>
> Q. Well, did he mention it to you is the question?
>
> A. Oh. I don't remember. I'll be honest with you, I -- honest to God, I don't remember if he did or not.
>
> > THE COURT: Excuse me. Did your – your grandson's wife, he had talked to her first. Did she call you on the phone and say there's somebody coming up to the house with some papers? Did she call you --

9

THE WITNESS: No, ma'am, huh-uh. No, ma'am. Now, are you saying the grandson's wife?

THE COURT: The lady that he talked to first, who told him where you lived, did she call you and say there's somebody on the way up to the house?

THE WITNESS: No, ma'am.

THE COURT: You never talked to her that day at all?

THE WITNESS: No, huh-uh. I don't know who you're talking about. I think you're talking about Zach's wife.

THE COURT: Yes, Zach's wife.

THE WITNESS: No, ma'am, I haven't talked to her about that -- any of that.

THE COURT: Never before?

THE WITNESS: Never.

THE COURT: Never since?

THE WITNESS: No. No, ma'am.

THE COURT: Go ahead.

Q. . . . Did -- did your grandson Zachary or his wife or anyone else call you or let you know that there was a man trying to serve papers on you --

A. No, sir.

Q. -- or the company?

A. No, sir.

10

Virginia stated that Charles might have told her about Reeves's coming to the house but that she did not recall.

Virginia and Charles's daughter Ginger McDaniel testified that she lived and worked not far from their home. She helped her parents with their questions about bills because both Charles and Virginia got things confused, Virginia "ha[d] some dementia," and Charles "c[ould]n't hear a whole lot."

Ginger further testified that Virginia had called her when Reeves came to their house, stating,

> Mom called me when the server showed up, and I'm assuming that it was a server. Mom called me and said that there was -- that Dad had said something, that there was some guy out there with some computer wanting her to sign something. And I said, what's it concerning? And she said, I have no idea.
>
> I asked -- I went by the house that afternoon. I said, Dad, you know, Mom said -- and Dad's like, I don't know what the dude wanted, he said, but we're not signing nothing. He said, I don't know who he is, I've never seen him before. I said, well, what was this concerning? He said, I don't know what it was concerning.

Ginger opined that Charles might not have picked up everything the process server said because he did not hear very well. She had warned her parents not to sign anything they did not understand and to call her with any questions.

Ginger testified that she had known nothing about the lawsuit until Virginia called her at work "all upset that they'd gotten a letter in the mail, a judgment letter,"

11

which she first said she thought had been "sometime in June,"[3] but she then corrected her testimony to say "September, maybe around the 25th." Virginia had told her that "they had got a letter in, and it said something about $300,000, and it had her name on it, and had Zachary['s] . . . name on it." Ginger stated that neither of her parents had understood the judgment letter, how serious it was, or "the fines and the accruing interest and everything that went along with it." Ginger told her parents that they needed to get a lawyer.

At the hearing's conclusion, the trial court took judicial notice of its file and heard the parties' arguments. Virginia's counsel argued, among other things, that an excusable mistake had occurred because Bishop Energy's process server had posted the citation where Virginia, who suffered from dementia, was unlikely to find it.

Regarding hardship or prejudice, Virginia's counsel argued that granting her a new trial would cause no harm to Bishop Energy because Bishop Energy would retain its judgment against Zachary. He asserted that if the trial court granted the motion, Virginia planned to file a crossclaim against Zachary and to cooperate with Bishop Energy in trying to get control of what was left of M Propane's assets so that Bishop

---

[3]At the conclusion of Ginger's testimony, the trial court asked her about what she had been aware of in June. Ginger replied that they lived in a small town and that her 72-year-old uncle—Virginia's brother, who ran a competing propane business—told her that he had heard rumors that M Propane was in trouble and owed a large bill that was not being paid. She learned about this in June but did not recall telling her parents "because they're older, and they get upset about things."

Energy could get paid. Virginia's counsel also pointed out that Bishop Energy had filed a claim in probate court against Lance's estate.

Bishop Energy's counsel responded that Bishop Energy had gone to great lengths to serve Virginia, who, according to him, had avoided and evaded service with Charles's assistance, stating, "We know that [Charles] knew what the man was there for . . . because the process server says that [Charles] told him that [Virginia] denies having anything to do with the propane business," and then Charles "refused to allow her" to speak with him or to accept the papers addressed to her. Bishop Energy's counsel confirmed that Bishop Energy had filed a claim against Lance's estate and that it would try to recover from the estate first, "but that doesn't negate the fact that *they* refused to accept service." [Emphasis added.]

The trial court opined that based on the evidence and a reasonable deduction from the evidence, "*they* knew exactly . . . why the process server was there, and *they* just thought that *they* could stonewall it, ignore it." [Emphases added.] The trial court denied Virginia's motion.

### III. Discussion

In her single issue, Virginia argues that the trial court abused its discretion by denying her motion for new trial. Bishop Energy responds that Virginia conceded in her motion that she had received the citation and its attachments[4] and that the trial

---

[4]In her motion, Virginia stated that "[w]hen she finally received the citation and attachments, she did not know what they were. She did not understand their

court could have reasonably found—based on Virginia's testimony at the hearing—that she and Charles had known why the process server was at their home but had decided to ignore the lawsuit.

"Texas courts view an appeal from a default judgment somewhat differently than an appeal from a trial on the merits. In part, this is because an adjudication on the merits is preferred in Texas." *Holt Atherton Indus., Inc. v. Heine*, 835 S.W.2d 80, 86 (Tex. 1992). A new trial should be granted when a defaulting party establishes that (1) the failure to appear was not intentional or the result of conscious indifference but was the result of an accident or mistake, (2) the motion for new trial sets up a meritorious defense, and (3) granting the motion will occasion no delay or otherwise injure the plaintiff. *Dolgencorp of Tex., Inc. v. Lerma*, 288 S.W.3d 922, 925 (Tex. 2009) (citing *Craddock*, 133 S.W.3d at 126).

Accident, mistake, or other reasonable explanation negates the intent or conscious indifference for which reinstatement can be denied. *Id.* (citing *Smith v. Babcock & Wilcox Constr., Co.*, 913 S.W.2d 467, 468 (Tex. 1995)); *see Fid. & Guar. Ins. Co. v. Drewery Constr. Co.*, 186 S.W.3d 571, 576 (Tex. 2006) (stating that intentional or conscious indifference occurs when "the defendant knew it was sued but did not care"). Under *Craddock*'s first element, some excuse—although not necessarily a good

___

meaning." But at the new-trial hearing, Virginia testified that she did not recall when she had first learned that she had been sued and that she did not recall if Charles had told her about the process server.

one—will suffice to show that a defendant's failure to file an answer was not because the defendant did not care. *In re Marriage of Sandoval*, 619 S.W.3d 716, 721 (Tex. 2021) (quoting *Sutherland v. Spencer*, 376 S.W.3d 752, 755 (Tex. 2012)).

"When applying the *Craddock* test, the trial court looks to the knowledge and acts *of the defendant* as contained in the record before the court." *Holt Atherton Indus., Inc.*, 835 S.W.2d at 82 (emphasis added). A defendant's burden on this element is satisfied when her factual assertions, if true, negate intentional or consciously indifferent conduct by her and the factual assertions are not controverted by the plaintiff. *B. Gregg Price, P.C. v. Series 1 - Virage Master LP*, 661 S.W.3d 419, 424 (Tex. 2023). However, "[w]hen the defaulting party fails to appear due to a lack of proper notice, the subsequent judgment is constitutionally infirm." *Id.* In that situation, *Craddock*'s meritorious-defense element is not required. *Id.*; *see Fid. & Guar. Ins. Co.*, 186 S.W.3d at 574 (stating that a default judgment's critical question is, "Why did the defendant not appear?" and that if the answer is "Because I didn't get the suit papers," then the default generally must be set aside, but if the answer is "I got the suit papers but then . . . ," the default judgment should be set aside only if the defendant proves all three *Craddock* elements).

We review the denial of a motion for new trial for an abuse of discretion. *B. Gregg Price, P.C.*, 661 S.W.3d at 423. A trial court abuses its discretion if it acts without reference to any guiding rules or principles—that is, if its act is arbitrary or unreasonable. *Low v. Henry*, 221 S.W.3d 609, 614 (Tex. 2007); *Cire v. Cummings*, 134

15

S.W.3d 835, 838–39 (Tex. 2004). A trial court also abuses its discretion by ruling without supporting evidence. *Ford Motor Co. v. Garcia*, 363 S.W.3d 573, 578 (Tex. 2012). But no abuse of discretion occurs when the trial court decides based on conflicting evidence, so long as *some* substantive and probative evidence supports its decision. *Unifund CCR Partners v. Villa*, 299 S.W.3d 92, 97 (Tex. 2009); *Butnaru v. Ford Motor Co.*, 84 S.W.3d 198, 211 (Tex. 2002) (op. on reh'g).

The trial court determines the fact questions raised when, as here, evidence is presented at a new-trial hearing. *See La. C Store Wholesaler, Inc. v. Royal Nett Apparel, LLC*, No. 02-17-00331-CV, 2018 WL 3059966, at *3 (Tex. App.—Fort Worth June 21, 2018, no pet.) (mem. op.). The trial court, as factfinder, may generally believe all, none, or part of the evidence and thus can reasonably believe, based on contradictory evidence, that a defendant behaved intentionally or with conscious indifference. *Id.*

But here, nothing in the record before us supports that finding or the trial court's observation that both Charles *and* Virginia knew why the process server was at their house and "just thought that *they* could stonewall it, ignore it." [Emphasis added.] To the contrary, the record reflects that there is *no* evidence that Virginia knew that Bishop Energy (via Reeves) was trying to serve her and that—at most, perhaps—her husband Charles might have known.[5] Charles was not sued, and it is

---

[5]However, the record does not show that the process server ever told Charles that he was trying to serve process on Virginia, either by word or by showing him the documents in his possession. As far as the record indicates, Charles could have thought Reeves was representing a creditor of the propane business for debt

16

the knowledge and acts of *Virginia*, an elderly lady in her late eighties with dementia, that matter for purposes of our review. *See Holt Atherton Indus., Inc.*, 835 S.W.2d at 82.

Further, while Virginia's new-trial motion conceded that she "finally received" the citation and attachments, the motion did not establish *when* she received them and therefore was not the concession that Bishop Energy touted it to be. Nothing in the record connected Virginia in June 2023 or thereafter—as opposed to her husband—to the business premises where the citation and service documents were posted. And both Virginia's declaration and her testimony reflect that she had not understood that she could be subject to the lawsuit until she received a copy of the final judgment, called her daughter for assistance, and then hired a lawyer on her daughter's advice.

Without notice, Virginia could not have intentionally or with conscious indifference failed to appear or otherwise to participate in the trial, and Bishop Energy did not bring forth any controverting evidence that Virginia knew about or understood the lawsuit against her or that she did not have dementia. *See B. Gregg Price, P.C.*, 661 S.W.3d at 424 (stating that the defendant's burden on the first element

---

collection, not attempting to serve process for one. *See United Rentals N. Am., Inc. v. Evans*, 668 S.W.3d 627, 642 (Tex. 2023) (stating that testimony that gives rise to any number of inferences, none more probable than another, "is legally insufficient to support the inference of a fact").

is satisfied when her facts negate intentional or consciously indifferent conduct, and the plaintiff does not controvert those facts).[6]

Based on the record before us, as well as the historic public policy that disfavors default judgments, we conclude that the trial court abused its discretion by failing to grant Virginia's new-trial motion, and we sustain Virginia's sole issue.

## IV.  Conclusion

Having sustained Virginia's sole issue, we reverse the trial court's judgment and remand the case for a new trial.

/s/ Bonnie Sudderth

Bonnie Sudderth
Chief Justice

Delivered:  August 22, 2024

---

[6]Further, in her new-trial motion, Virginia asserted that setting aside the default judgment would not work a hardship or prejudice on any party, and Bishop Energy presented no evidence at the hearing that setting aside the default judgment would work a hardship on it or prejudice it.