IN THE COURT OF APPEALS OF TENNESSEE
AT JACKSON
June 8, 2005 Session

## FORREST L. WHALEY, ET AL. v. JIM ANN PERKINS, ET AL.

**A Direct Appeal from the Circuit Court for Shelby County**
**Nos. 95604 T.D. & 94890     The Honorable Rita L. Stotts, Judge**

---

**No. W2004-02058-COA-R3-CV - Filed July 21, 2005**

---

Purchasers of real property filed suit for breach of contract, negligence per se, intentional misrepresentation, breach of warranty of title, and emotional distress against various parties, alleging that purchasers had purchased the subject property in reliance upon misrepresentations by defendants as to the merchantability of title to the property, only to discover later that the property had been illegally subdivided by defendants. Purchasers contended that they suffered catastrophic pecuniary and other loss as result of alleged misrepresentations, due to extremely limited legal uses that could be made of illegally subdivided parcel. At trial, jury found that each of the defendants had committed intentional misrepresentation, and awarded compensatory damages in the amount of $170,000 and punitive damages in the amount of $5,000. Defendants appeal on numerous grounds. Finding that the trial court erred, we vacate and remand.

**Tenn. R. App. P. 3; Appeal as of Right; Judgment of the Circuit Court Vacated and Remanded**

W. FRANK CRAWFORD, P.J., W.S., delivered the opinion of the court, in which ALAN E. HIGHERS, J. and HOLLY M. KIRBY, J., joined.

John D. Horne of Memphis for Appellants, Jim Ann Perkins, Albert Lewis Beshires and Terry Lynn Beshires

Richard M. Carter, Paul H. Morris, and Brian K. Kelsey of Memphis for Appellees, Forrest L. Whaley and Margaret Ann Whaley

### OPINION

### I. PROCEDURAL HISTORY

On May 26, 1998, Appellees, Forrest L. Whaley and Margaret Ann Whaley, filed a complaint for breach of contract, misrepresentation, and breach of warranty of title against Jim Ann Perkins,

Albert Lewis Beshires, Terry Lynn Beshires, and First American Title Insurance Company of the Mid-West. On June 5, 1998, Perkins filed a motion to dismiss and answer. On July 2, 1998, the Whaleys filed a second complaint for money damages against Jim Thompson, Barbara Thompson, d/b/a Thompson Real Estate, Shirley Perkins and Mary Jane Smith, d/b/a Banyan Tree Realtors. On July 27, the Beshires filed a separate motion to dismiss and answer. On September 16, 1998, the Whaleys filed an amended complaint adding as a defendant M. Stephen Brandon, who acted as closing attorney for the Whaleys in their purchase of the property. On November 17, 1998, the Beshires filed a motion to dismiss and answer to the Whaleys' amended complaint, incorporating their original defenses and alleging that any damages the Whaleys may have sustained resulted from the negligence of Brandon. On November 17, 1998, Perkins also filed a motion and answer to the Whaley complaint, reiterating the original defenses and also alleging that any damages the Whaleys may have sustained resulted from the negligence of Brandon.

On October 16, 2000, the Whaleys filed a Notice of Voluntary Nonsuit as to Brandon, which was entered by the trial court on December 11, 2000. On October 20, 2000, an Order was entered in the Trial Court granting the motion to amend their complaint. On October 25, 2000, the Whaleys second amended complaint, which primarily added a count for damages for emotional distress, was filed against defendants. On November 6, 2000, Thompson filed an Answer and Motion to Dismiss the Whaleys' second amended complaint. On December 1, 2000, Banyan Tree filed its answer and motion to dismiss the Whaleys' Second Amended Complaint. On February 15, 2002, the trial court, in response to motions for summary judgment, ruled that "the mental and emotional distress allegedly suffered by the Whaleys arises as a result of the injury to their property and the three year statute applies." The trial court also granted American's motion for summary judgment, finding that "the purpose of the title policy was to address issues relating to legal ownership, not value." On August 7, 2002, the trial court entered an order denying the Whaleys' motion for reconsideration of the grant of summary judgment as to First American, and certified that summary judgment as a final judgment pursuant to TRCP Rule 54.02.

On March 30, 2004, in response to the Whaleys' appeal from the award of summary judgment as to First American, this Court entered an Order Affirming the Judgment of the Trial Court and dismissing the Whaleys' claims against First American. This Court also affirmed the trial court's grant of summary judgment to Lawyer's Title and dismissed the Whaleys' claims against it.

On May 19, 2003, Perkins and Beshires filed a consolidated answer to the Whaleys' second amended complaint.

A jury trial took place from April 4, 2004 through April 13, 2004. On April 13, 2004, at the close of the Whaleys' proof, Perkins moved for directed verdict, arguing that the proof showed that Perkins had played no part in the sale of the property to the Whaleys, that the Whaleys had not relied in any manner upon Perkins, and that the Whaleys' claim for damages for emotional distress were barred by the one-year statute of limitations governing personal injury. The trial court took the motions under advisement. At the close of the proof, Perkins renewed her motions for directed

verdict. This motion was denied by the trial judge and the parties presented their arguments to the trial judge regarding jury instructions.

After a jury trial, the jury returned a verdict for the Whaleys. The jury found Ms. Perkins, Mr. and Ms. Beshires, Jim and Barbara Thompson d/b/a Thompson Real Estate, Shirley Perkins McKee and Mary Jean Smith d/b/a Banyan Tree Realtors, and Stephen Brandon to be at fault. The jury apportioned fault as follows: Jim Ann Perkins was found to be 30% at fault; Albert Beshires was found to be 20% at fault; Terry Lynn Beshires was found to be 40% at fault; Jim Thompson and Barbara Thompson d/b/a Thompson Real Estate were found to be 1% at fault; Shirley Perkins McKee and Mary Jean Smith d/b/a Banyan Tree Realtors were found to be 8% at fault, and Stephen Brandon was found to be 1% at fault. The jury further found that the actions of Jim Ann Perkins, Albert Beshires, and Terry Lynn Beshires constituted intentional misrepresentation. The jury awarded compensatory damages to the Whaleys in the amount of $170,000.00. After the punitive damages phase of the trial, the jury awarded the Whaleys punitive damages against Jim Ann Perkins in the amount of $2,000.00, Terry Beshires in the amount of $2,000.00, and Albert Beshires in the amount of $1,000.00. On May 10, 2004, a Judgment on Jury Verdict was entered.

On June 8, 2004, Perkins and Beshires filed separate Motions for Judgment N.O.V., for New Trial, or in the Alternative, for Remittitur. On July 20, 2004, after conducting a hearing, the trial court entered orders denying these motions. On August 11, 2004, Perkins and the Beshires filed a timely notice of appeal to this Court.[1]

## II. FACTS

This appeal concerns a parcel of real property located in the eastern part of Shelby County, Tennessee.[2] The parcel was originally part of a 500-acre farm that had been in the family of one of the Appellants, Jim Ann Perkins ("Ms. Perkins"), since approximately 1938. Ms. Perkins and her sisters inherited shares of the family farm after their parents died. Ms. Perkins' daughter, Terry Beshires, married Albert Beshires in 1975. In 1985, Terry Beshires asked Perkins if she could give the Beshires some land on the family farm so that they could build a home. Perkins gave the Beshires two acres as a place to build a home. In 1985, Albert Beshires was 33 years of age, and neither had built a home before.

In July, the Beshires obtained a sidewalk permit to construct a driveway on the property, and on August, the Beshires obtained approval to install a septic line. On August 28, 1985, Ms. Beshires went to the Memphis and Shelby County Office of Construction Code Enforcement to obtain a building permit. Beshires stated that she gave information to a clerk in that office who prepared the permit. Mrs. Beshires called Perkins and asked if she could sign Perkins' name to the building permit. While the Beshires were to be owners of the property upon which the residence was to be

---

[1] The other defendants set out above did not appeal.

[2] This statement of facts is adapted, largely verbatim, from the Appellants' statement of facts in their appeal brief.

constructed, the building permit was issued to Perkins as "owner" and reflected the "owner" to be the contractor for the purpose of construction. Perkins testified that she played no role in the construction of the house, in installing the septic line, or obtaining the building permit.

On October 29, 1985, a warranty deed prepared by Earl Daley, a Memphis attorney, was executed by Perkins, transferring the two-acre parcel described in the October 24, 1985 survey to the Beshires. That deed was recorded in the Office of the Register of Shelby County, Tennessee on October 30, 1985 at Instrument No. X1 6715.

Sometime later, Earl Daley, who had prepared the warranty deed for the property, told Perkins that the Beshires would need two more acres, so Perkins told Mr. Daley to prepare papers for those two additional acres. On December 12, 1985, Perkins executed a second warranty deed prepared by Mr. Daley conveying a contiguous two-acre parcel to the Beshires. That warranty deed was duly recorded in the Office of the Register of Shelby County, Tennessee on March 19, 1986. With the execution of the December 12, 1985 deed, the Beshires now owned four contiguous acres and had fifty (50) feet of road frontage.

In 1988, the Beshires decided to sell their home in Shelby County, so they could move to Fayette County. Accordingly, on January 14, 1988, the Beshires listed their residence for sale with Banyan Tree Realtors. On April 15, 1988, when the residence had not sold, the Beshires re-listed their residence with Banyan Tree Realtors. In that listing agreement, the Beshires indicated that the residence could be purchased with two acres or four acres. Shortly thereafter, the Whaleys were shown the property and were told that the house and two acres (the property) could be purchased for $136,000.00, or the house and four acres could be purchased for $157,000.00. On April 18, 1988, the Whaleys submitted an offer to purchase the residence and two acres (the property) for the sum of $125,000.00. The Beshires accepted the Whaleys' offer on April 21, 1988. On November 27, 1988, a closing was conducted by M. Stephen Brandon, an attorney, pursuant to which the Beshires were the sellers of the property, the Whaleys were the purchasers/mortgagors, and Mercantile Mortgage Corporation was the mortgagee of the property. At the closing, the Beshires executed a warranty deed in favor of the Whaleys and the Whaleys executed a trust deed in favor of Mercantile Mortgage in both of which the property was described by metes and bounds description. The warranty deed and trust deed were duly recorded on June 1, 1988, in the Office of the Register in Shelby County.

Perkins did not participate in the sale of the property to the Whaleys, and she testified that she "did not know anything about it at all." On July 6, 1992, seven years after Perkins had made transfers to the Beshires and four years after the Beshires had transferred the property to the Whaleys, John Masserano, a real estate attorney in Collierville, Tennessee, prepared a quitclaim deed pursuant to which the Beshires transferred back to Perkins the two-acre parcel that had adjoined the property. That quitclaim deed was recorded on July 14, 1992, in the Office of the Register of Shelby County, Tennessee, at Instrument No. CY 6405. In preparing that quitclaim deed to return the two-acre parcel back to the farm in 1992, John Masserano said nothing to Perkins about there being anything wrong with the two-acre transfer.

In 1995, Perkins sold the remainder of the farm, including the two acres that had been returned in 1992, to a Mr. McCarty for subdivision development. That transaction was also handled by John Masserano.

On July 3, 1995, after a subdivision application for the farm had been filed, the Office of Planning and Development for Memphis and Shelby County (OPD) sent the Whaleys a notice of hearing regarding the approval of the subdivision. The OPD notice indicated that a public hearing would be conducted by the Memphis and Shelby County Land Use Control Board (LUCB) on July 13, 1995 at the City Council Chambers in Memphis City Hall. On July 13, 1995, the OPD filed a staff report that concluded that "the Whaley property, however, appears to have been created in violation of the subdivision regulations." OPD also indicated that:

> The applicant will need to demonstrate that the Whaley property is a lot of record, or that all efforts have been exhausted to include it within the boundaries of this subdivision application.

OPD made the following recommendation:

> 4.     Demonstrate that both the Radcliff and the Whaley properties are either legal lots of record, legally exempt lots, or include them within the boundaries of this subdivision application.

The Whaleys received the OPD report recommendations on July 13, 1995, and assert that it was their first knowledge that the property had not been properly subdivided. Denise Sharp, an OPD employee who had authorized the July 13, 1995 staff report, noted that the minimum lots that could be obtained without subdivision approval were four acres with 50 feet of road frontage. Mrs. Whaley claimed that she had contacted Perkins in 1995, after Ms. Perkins had sold the farm to Mr. McCarty, apparently after July 13, 1995, but Ms. Perkins advised her that there was nothing she could do to assist the Whaleys. At the Whaleys' request, Ms. Perkins obtained a copy of the Beshires' building permit and left it in her mailbox. On August 2, 1995, the Whaleys signed a paper agreeing to have the property included in the Timberlake Subdivision.

On May 26, 1998, almost three years after they had first learned that the property may not have been properly subdivided, and may not be a legal lot, the Whaleys filed a complaint against Perkins, the Beshires, and First American, alleging breach of contract, misrepresentation, and breach of warranty of title.

At trial, the Whaleys testified that after learning of the illegal subdivision, Mr. Whaley became nervous and worried all the time, wondering what would happen if a storm hit the house. The Whaleys stated that they had planned to retire in 1995, sell the property, and move to Alabama. The Whaleys testified that their retirement plans became impossible, because they stated that they were unable to sell the property. When asked the following question by her attorney, Ms. Whaley stated:

Q.  [T]he illegality of your lot, or your parcel? How did that affect you and your husband and your plans?

A.  ... [E]verything that we had always planned for, since the day we got married, we were unable to do.

The Whaleys testified that after the 1995 discovery, Mr. Whaley could not retire, but thereafter experienced substantial pressure on his job and couldn't give his job full attention. Mr. Whaley testified that the condition of the property had caused Ms. Whaley to be depressed, nervous, and caused her to worry frequently because she could not see her grandchildren. Ms. Whaley testified that she and Mr. Whaley were up all night after they were advised of the illegal subdivision, and when they had called Denise Sharp at OPD, Ms. Whaley was devastated. The Whaleys claimed that while they owned two other parcels of real property in Alabama, they could not afford to build a home on their property on the river in Alabama because they could not sell the Shelby County property. Mr. Whaley claimed that Ms. Whaley had spent "millions of hours trying to get the problem worked out." Ms. Sharp with OPD testified that Ms. Whaley called her 3-4 times per year to inquire about the status of the Timberlake Estates subdivision. The Whaleys also claimed that Ms. Whaley developed arthritis, and now has to walk with a cane, had to cash in her 401K to make house payments, all of which caused them to argue and had caused Mr. Whaley to be up at night with chest pains. Ms. Whaley testified that the property was worthless because it couldn't be sold.

### III. ISSUES

Appellants, Jim Ann Perkins, Albert Lewis Beshires, and Terry Lynn Beshires, present the following issues on appeal:

1.  Whether the trial court committed reversible error when it denied Perkins' motions for directed verdict and affirmed the jury verdict that found Perkins liable for intentional misrepresentation, when there was no material evidence to support that verdict.

2.  Whether the trial court committed reversible error when it denied Perkins' motion for judgment N.O.V. on the issue of negligence per se for alleged violations of statutes and ordinances prohibiting transfers of tracts of property less than four acres without subdivision approval, when there was no material evidence to support that verdict.

3.  Whether the trial court commit reversible error by permitting Plaintiffs to assert claims for emotional distress that should have been barred by the one-year statute of limitations set forth in T.C.A. § 28-3-104(a)(1).

4.  Whether the trial court committed reversible error when its instructions to the jury on the issues of emotional distress and measure of damages were incorrect and confusing.

5.  Whether the trial court committed reversible error when it permitted the jury to allow passion associated with the plaintiffs' claims of emotional distress to affect its verdict.

6. Whether the trial court committed reversible error when it affirmed a jury verdict that was excessive, inconsistent, and irreconcilable.

## IV. STANDARD OF REVIEW

Where, as here, a trial judge has approved a jury's verdict, our standard of review is whether there is any material evidence to support the jury's verdict. Tenn. R.App. P. 13(d). Absent a reversible error of law, we will set aside a judgment on a jury verdict only where the record contains no material evidence to support the verdict. *Foster v. Blue*, 749 S.W.2d 736- 741 (Tenn.1988).

## V. ANALYSIS

**1. Did the trial court commit reversible error when it denied Perkins' motions for directed verdict and affirmed the jury verdict that found Perkins liable for intentional misrepresentation, when there was no material evidence to support that verdict?**

Appellants contend that there was no material evidence supporting the jury's verdict that Ms. Perkins committed intentional misrepresentation, and that, therefore, the trial court erred in failing to grant the motion for directed verdict on this issue. Appellants assert that the Whaleys have not alleged that Ms. Perkins made any representations to them, either orally or in writing, during the negotiation for, and purchase of, the property in question. The Whaleys assert that "there is material evidence that Perkins and Beshires all acted in concert in committing the intentional misrepresentation at issue here." This concerted action, the Whaleys contend, is evidenced by the fact that Ms. Perkins gave Ms. Beshires permission to sign various permit applications in Ms. Perkins' name. At trial Ms. Perkins did not deny that she permitted Ms. Beshires to sign her name, but she denied that this indicated any concerted attempt to make a misrepresentation to the Whaleys. Rather, Ms. Perkins and the Beshires testified that since Ms. Perkins had not yet transferred the initial two acres to the Beshires at the time that they were seeking the driveway, septic, and building permits, it was necessary for them to sign her name since she was still the owner of the property.

In Tennessee, an action for fraudulent misrepresentation contains four elements:

(1) an intentional misrepresentation of material fact, (2) knowledge of the representation's falsity, and (3) an injury caused by reasonable reliance on the representation. The fourth element requires that the misrepresentation involve a past or existing fact or, in the case of promissory fraud, that it involve a promise of future action with no present intent to perform. Nondisclosure will give rise to a claim for fraud when the defendant has a duty to disclose and when the matters not disclosed are material.

*Spectra Plastics, Inc. v. Nashoba Bank*, 15 S.W.3d 832, 840-1 (Tenn. Ct. App.,1999) (quoting *Axline v. Kutner*, 863 S.W.2d 421 (Tenn. Ct. App. 1993)). Under the elements of fraudulent misrepresentation as they are set out in *Spectra Plastics*, there are two ways in which a party can be liable for fraudulent misrepresentation: by (a) making an intentional misrepresentation of material

fact, or by (b) not disclosing a material fact that a party has a duty to disclose. It is clear that Ms. Perkins did not make an intentional misrepresentation to the Whaleys. There was no evidence adduced at trial that Ms. Perkins had made *any* representations to the Whaleys prior to, or during, their purchase of the subject property.[3] Since she made *no* representations to the Whaleys whatsoever, Ms. Perkins clearly did not make any intentional misrepresentations to the Whaleys that would subject her to liability for fraudulent misrepresentation. With regard to non-disclosure of a material fact, we conclude that Ms. Perkins cannot be liable for fraudulent misrepresentation on this basis, either. Ms. Perkins had conveyed four acres of her property to the Beshires several years prior to the Whaleys' purchase of the property that is the subject of this appeal. We find no authority under Tennessee (nor do the Whaleys direct us to any) supporting the proposition that Ms. Perkins had any duty to the Whaleys. She had not been the owner of the subject property for several years. It is conceded by all parties that Ms. Perkins was not involved in the sale of the property to the Whaleys. It cannot be said that Ms. Perkins had a duty to disclose any information to the Whaleys and Ms. Perkins cannot be deemed to be liable for fraudulent misrepresentation on this basis.

Therefore, we agree with the Appellants that there was no material evidence to support the jury's verdict that Ms. Perkins was liable for fraudulent misrepresentation. The trial court's refusal to grant Ms. Perkins' motion for directed verdict as to intentional misrepresentation constitutes reversible error.

2.      **Did the trial court commit reversible error when it denied Perkins' motion for judgment N.O.V. on the issue of negligence per se for alleged violations of statutes and ordinances prohibiting transfers of tracts of property less than four acres without subdivision approval, when there was no material evidence to support that verdict?**

Appellants next contend that the trial court erred in refusing to grant judgment N.O.V. on the issue of negligence per se. At the close of proof, the trial court instructed the jury on negligence per se, stating as follows:

And in the state of Tennessee a person who violates a state statute or municipal ordinance is negligent. However a person violates a statute or ordinance is not at fault unless you also find that a violation was a legal cause of the injury or damage for which claim has been made.

With regard to the allegations of negligence per se or violation of the statutes or ordinances, Tennessee Code Annotated reads as follow[s] — and this is on a part of the statute but for our purposes it reads that no plat of a subdivision of land shall be recorded until it shall have been approved by the regional planning commission.

---

[3]      Ms. Perkins did, according to testimony at trial, have several conversations with the Whaleys after they purchased the property.

Tennessee Code Annotated 13-3401 read[s] in pertinent part that subdivision means any division of 5-acres or less for the purpose whether immediate or future of sale or building development. Tennessee Code Annotated 13-3403 reads that in exercising the powers granted to it by Tennessee Code Annotated 13-3402, the regional planning commission shall adopt regulations governing the subdivision of land within it's [sic] jurisdiction.

Shelby County Code Section 25-261 reads that boards of county commissioners shall have the authority to pumicate [sic] by ordinance subdivision regulations governing the division, subdivision, or resubdivision of land into two or more parcels any of which is 4-acres or less in size for the purpose of conveyance or building development.

Tennessee codes subdivision regulations section 105 reads that no land shall be subdivided within and [sic] unincorporated portion of Shelby County until a subdivider has obtained approval of the preliminary plan and final plat.

The following do not require application for a subdivision to the land use control board: Any division—subdivision of land where each lot created has at least four acres of area, has a depth no greater than four times the average width, and a minimum of 50 feet of frontage on a public road.

Shelby County subdivision regulation section 110 reads A 1, no owner or agent of the owner or of any parcel of land—excuse me. Let me start it again.

No owner or agent of the owner of any parcel of land in a proposed subdivision for which a preliminary plan has been filed shall transfer or sell any such lot or portion of the proposed subdivision before a final plat of such subdivision has been approved by the appropriate governing body in accordance with the provision of these regulations and recorded in the office of the Shelby County Registrar.

The subdivision of any lot or parcel of land by the use of meats [sic] and bounds description for the purpose of sale, transfer, or lease with the intent of evading these regulations shall not be permitted. All such described subdivisions shall be subject to all the requirements contained in these regulations.

No street number or building permit shall be issued for the erection of any building or structure located on a lot, plat, or parcel of which violates the provision of these regulations.

You've heard me use the term legal cause. A legal cause of an injury which there is a cause which is in natural and continuous sequence produces an injury and without which the injury would not have occurred.

Appellants argue that the trial court erred in instructing the jury on negligence per se. First, Appellants argue, Ms. Perkins corrected any illegality occasioned by her first transfer of two acres to the Whaleys, by transferring another two-acre parcel a few months later on the advice of her attorney Earl Daley. Appellants direct us to the trial testimony of Nat Parham, an attorney with fifty years of experience in real estate law, that Ms. Perkins' subsequent conveyance of two acres corrected the "less than four acre issue." Appellants further argue that even if the illegality was not corrected, the three-year statute of limitations for injury to property would have expired in 1988, seven years before the Whaleys filed their lawsuit.

The doctrine of negligence *per se* stands for the proposition that, in some circumstances, the violation of a statute or ordinance may constitute negligence in itself. However, it is not the case that violation of every statute or ordinance constitutes negligence per se. A leading treatise explains negligence per se as follows:

> In order for the violation of a statute or ordinance to constitute negligence per se, the statute or ordinance violated must be a specific requirement to do or omit to do a definite act; the violation of a statute or ordinance prescribing merely a rule of conduct is not negligence per se, although it may be evidence of negligence. Thus, while violation of a statute or ordinance may be in and of itself a negligent act or omission, it does not necessarily constitute actionable negligence, or make out an absolute case of liability, and is not tantamount to strict liability, since other elements must co-exist to make the negligence actionable.
>
> In order for a statute or regulation to be applied to establish a standard of care under the theory of negligence per se, a statute or regulation must at a minimum promote public safety and have been enacted to protect persons in plaintiff's position or to prevent the type of accident that occurred, and must also impose specific duties on defendant. It must not merely repeat the common-law duty of reasonable care, but it must set forth specific guidelines to govern behavior. The test to determine whether a violation of a statute may constitute negligence per se depends upon legislative intent; legislative intent is primarily determined by the language of the statute, the purpose of the statute, and the nature of the evil the statute sought to remedy.

65 C.J.S. *Negligence* § 136 (2000). We must, therefore, determine the legislative intent of the subdivision ordinance at issue in this appeal in order to determine whether the trial court erred in charging the jury on this count.

Under T.C.A. 13-3-403, "the regional planning commission shall adopt regulations governing the subdivision of land within its jurisdiction." The statute goes on to set forth the purpose for such regulations:

> Such regulations may provide for the harmonious development of the region and its environs; for the coordination of roads within the subdivided land with other existing

or planned roads or with the state or regional plan or with the plans or municipalities in or near the region; for adequate open spaces for traffic, light, air and recreation; for the conservation of or production of adequate transportation, water, drainage and sanitary facilities; for the avoidance of population congestion; and for the avoidance of such scattered or premature subdivision of land as would involve danger or injury to health, safety or prosperity by reason of the lack of water supply, drainage, transportation or other public services or would necessitate an excessive expenditure of public funds for the supply of such services.

The subdivision ordinance in question here is the Shelby County Code, Appendix B ("the Subdivision Ordinance"). The Subdivision Ordinance sets includes its own statement of purpose:

**Purposes.**

These regulations are adopted for the following purposes:

A.    To protect and provide for the public health, safety and general welfare.

B.    To guide the future growth and development of the city/county in accordance with the comprehensive plan, transportation plans, and other approved or adopted plans and policies.

C.    To protect the character, and the social and economic stability of all parts of the county and to encourage the orderly and beneficial development thereof.

D.    To protect and conserve the value of land, the value of buildings and improvements thereon, and to minimize conflicts among uses of land and buildings.

E.    To prevent overcrowding or overdevelopment of land and undue congestion of population.

F.    To guide public and private policy, and action to provide adequate and efficient public facilities.

G.    To provide sufficient and effective traffic circulation with particular regard to the avoidance of congestion on streets and highways, the safe accommodation of pedestrian traffic movements, and the proper location and width of streets, and building line location.

H.    To establish reasonable standards and procedures for subdivisions and resubdivisions to further the orderly layout and use of land; and to insure proper legal descriptions and monumenting of subdivided land.

I.    To consider the availability of public facilities and determine if there is sufficient capacity to serve the proposed subdivision.

J.    To minimize the pollution of air, streams, and ponds; to determine the adequacy of drainage facilities; to safeguard the water table; and to encourage the wise use and management of natural resources.

K.    To encourage the preservation of the natural beauty and topography, and to encourage appropriate development with regard to these natural features.

We conclude that the harm of which the Whaleys complain—being unable to sell their property since it was subdivided illegally—does not bring them within the class of persons protected by the Shelby County Subdivision Ordinance. As another panel of this court stated, the mere violation of a statute does not automatically trigger the negligence per se doctrine:

> The negligence per se doctrine is not a magic transformational formula that automatically creates a private negligence cause of action for the violation of every statute. Not every statutory violation amounts to negligence per se. To trigger the doctrine, the statute must establish a specific standard of conduct.... The courts consider a number of factors to determine whether the violation of a statute should trigger the negligence per se doctrine. The two threshold questions in every negligence per se case are whether the plaintiff belongs to the class of persons the statute was designed to protect and whether the plaintiff's injury is of the type that the statute was designed to prevent.

*Rains v. Bend of the River*, 124 S.W.3d 580, 590-1 (Tenn. Ct. App. 2003). The Whaleys' alleged inability to sell their home is, if true, a consequence of the statute providing for the four-acre minimum, but their alleged harm is not the kind of injury the statute was designed to prevent. As described in both the Tennessee Code and the Shelby County Subdivision Ordinance, these subdivision regulations were enacted largely for reasons related to quality of life, among them, assuring adequate public facilities for residents, minimizing pollution, providing for orderly layout and use of land, protecting the value of land, preventing overcrowding, and assuring effective traffic circulation. The harm alleged by the Whaleys is not a harm the regulations were designed to prevent, but rather, it is an accidental consequence of a statute enacted to prevent *other* harms to the community and its residents that could be caused by the unregulated subdivision of land.

We conclude that the trial court erred in instructing the jury on the issue of negligence per se, and the error "more probably than not" affected the jury verdict. Tenn.R.App.P. 36(b).

3. **Did the trial court commit reversible error by permitting Plaintiffs to assert claims for emotional distress that should have been barred by the one-year statute of limitations set forth in T.C.A. § 28-3-104(a)(1)?**

The Appellants' next issue concerns the Whaleys' claims of emotional distress. The Appellants allege that the trial court erred in permitting the Whaleys to assert a claim in the amended complaint filed October 2000 for emotional distress, arguing that the claim is barred by the one-year statute of limitations applicable to personal injury claims. The Whaleys testify that they began having emotional distress in 1995, after they learned of the problem with their property. The Whaleys contend that, since the "gravamen" of their complaint is property damage, "[t]he Whaleys were entitled to allege, and the trial court correctly instructed the jury to consider, their emotional distress as consequential damages caused by the injury to their property caused by the Appellants." The Whaleys cite the cases of *Gunter v. Lab Corp. Of Am.*, 121 S.W.3d 636, 638 (Tenn. 2003) and *Prescott v. Adams*, 627 S.W.2d 134, 137 (Tenn. Ct. App. 1981) in support of the proposition that the statute of limitations for emotional distress should actually be governed by the three-year statute

of limitations applicable to the cause of action for harm to property. In ***Gunter v. Lab Corp. Of Am.***, the plaintiff, Stanley Gunter, had been ordered to pay child support based on the results of a paternity test conducted by Laboratory Corporation of America ("LabCorp"), which indicated that there was a 99.94% chance that the plaintiff was father of the minor child. Gunter sued Labcorp, alleging that it negligently performed the paternity test and overstated the probability of paternity. He alleged negligence and breach of contract, and he "sought damages in the amount of the economic loss occasioned by the ... child support payments." *Id*. at 638. LabCorp alleged that the one-year statute of limitations applicable to personal injury claims applied, and had run prior to Gunter's filing of the complaint. Gunter claimed that the three-year statute of limitations for personal property tort actions should apply instead. The trial court ruled that the case was controlled by the one-year statute of limitations for personal injury actions; the Court of Appeals reversed, concluding that the three-year statute for injury to property was applicable. The Supreme Court affirmed the Court of Appeals, stating that Gunter's alleged economic injury was an injury to property and thus fell under the three-year statute of limitations. The instant case differs from the Gunter facts in an important respect—in ***Gunter***, the dispute over the applicable statute of limitations arose out of the ambiguity of the phrase, "injury to the person." The Court surveyed cases in which non-physical injuries, such as injury to reputation, fell under the rubric of "injuries to the person." The question, then, was whether an economic harm such as that suffered by Gunter was to be classified as an injury to the person or an injury to property. In the instant case, there is no such ambiguity. The gravamen of the emotional distress claim is uncontroversial; emotional distress is an injury to the person. Indeed, the case of ***Brown v. Dunstan***, 409 S.W.2d 365 (1966), upon which the Supreme Court relied in ***Gunter***, eloquently expresses the scope of "injuries to the person":

> It is then our conclusion that the phrase 'injuries to the person' as used in the instant statute is to be construed comprehensively and as contemplating its application to actions involving injuries that are other than physical. Its purpose is to include within that period of limitation actions brought for injuries resulting from invasions of rights that inhere in man as a rational being, that is, rights to which one is entitled by reason of being a person in the eyes of the law. Such rights, of course, are to be distinguished from those rights which accrue to an individual by reason of some peculiar status or by virtue of an interest created by contract or property.

*Id*. at 367. The second case cited by the Whaleys, ***Prescott v. Adams***, 627 S.W.2d 134 (Tenn. Ct. App. 1982), involves causes of action that all pertain to injury to property: fraud in the inducement, misrepresentation, negligence in the design of an improvement to real property, breach of fiduciary duty, and breach of implied warranties of habitability and marketability. *Id.* at 137. This Court stated that the three-year statute of limitations governed all of the causes of action, because the gravamen of the complaint was injury to property. However, the ***Prescott*** case differs in a crucial respect from the case before us now. In ***Prescott***, all of the causes of action sought recovery for injury to property—there was no cause of action that even arguably could be considered an injury to the person. In the instant case, the cause of action for emotional distress differs from the causes of action for injury to property, in seeking recovery for what is, without question, an "injury to the person." For this reason, we conclude that the trial court erred in permitting the Whaleys to proceed

-13-

with their claim against the Appellants for emotional distress; the complaint was time-barred since they filed suit well after the one-year statute of limitations for emotional distress had elapsed.

**4.    Did the trial court commit reversible error when its instructions to the jury on the issues of emotional distress and measure of damages were incorrect and confusing?**

Appellants assert that the trial court's jury instructions on emotional distress and the measure of damages were incorrect and confusing. Our review of the trial transcript reveals that the jury instructions were indeed somewhat confusing.

Since the emotional distress claim for damages was erroneously allowed, the inclusion of instructions concerning emotional distress was improper. In that regard, the court instructed the jury as follows:

> You've heard reference to the term emotional distress. Emotional distress is mental distress, mental suffering, or mental anguish. It includes all highly unpleasant mental reactions such as fright, horror, grief, shame, humiliation, embarrassment, anger, chagrin, disappointment and worry.
>
> *                    *                    *
>
> If you decide that a party's entitled to damages you must fix an amount that will reasonably compensate that party for each of the following elements: Of claim loss or harm if you find that it was suffered by that party and was caused by the conduct upon which you base your finding of fault [sic]. Each of these elements of damages is separate. You may not duplicate these damages for elements by also including that same for [sic] harm in another element of damage [sic].
>
> Reasonable compensation for such emotional injuries suffered by the plaintiffs and legally caused by the defendants' conduct is one element of damages in this case. A serious emotional injury occurred one [sic] a reasonable person normally constituted would be unable to adequately cope with the mental stress caused and brought about by the circumstances of the case.
>
> There is no mathematical [sic] for computing reasonable compensation for negligent infliction of serious emotional injury, nor is the opinion of any witness required as to the amount of such compensation. And in making [an] award of such damages you must use your best judgment and establish an amount of damages that is fair and reasonable in light of the evidence before you.

The trial court also gave the following instructions pertaining to the measure of damages for damage to property, which closely correspond to 8 Tennessee Pattern Jury Instructions—Civil 14.45 (T.P.I. 14.45):

> The measure of damages to real property is the lesser of the following amounts: The reasonable cost of repairing the damage to the property, or the difference between the fair market value of the property immediately prior to and immediately after the damage. That allegation or that charge relates to the Perkins and the Beshires only.

Somewhat later, the trial court gave the following instructions, pertaining to the measure of damages for misrepresentation, which correspond to 8 Tennessee Pattern Jury Instructions—Civil 8.49 (T.P.I. 8.49):

> If you find that the plaintiffs are entitled to a verdict against certain defendants you must then award damages in an amount that will reasonably compensate the plaintiffs for all of the loss suffered that was legally caused by the misrepresentation upon which you based your finding of liability.
>
> You will award the plaintiffs the benefit of the bargain. The benefit of the bargain is the difference between the value of what the plaintiff would have received if the misrepresentation had been true and the actual value of what the plaintiff received.
>
> Actual value means market value. Market value is the highest selling price that real or personal property would bring on the open market. In making your finding of market value, you will assume that the seller has a reasonable time to sell and that the seller is willing to sell but not forced to do so.
>
> You will also assume that the buyer is ready, able and willing to buy but is not forced to do so and that the buyer had a reasonable time and full opportunity to investigate the property and to determine it's [sic] condition[,] suitability for use and all the things about the property that would naturally and reasonably affect its market value. That charge relates to the Beshires.

Upon reviewing the jury instructions as a whole, it appears that the jury instructions are confusing and the inclusion of instructions pertaining to the personal injury claim for emotional distress was error which affected the jury's verdict.

Although the TPI 8:49 instruction is the correct measure of damages for misrepresentation claims, the inclusion of TPI instruction 14:45 appears to create difficult confusion but in and of itself is possibly harmless error. However, the inclusion of the instruction for emotional distress is error, and, more probably than not, affected the verdict of the jury.

-15-

**5.** **Did the trial court commit reversible error when it permitted the jury to allow passion associated with the plaintiffs' claims of emotional distress to affect its verdict?**

Appellants contend that the trial court committed error in permitting plaintiffs' claims of emotional distress to affect the jury's verdict. We conclude that the consideration by the jury of damages for emotional distress constitutes reversible error. The jury was instructed on emotional distress and was allowed to award damages to the Whaleys for the emotional distress they suffered. However, in the jury verdict form provided by the trial court to the jury, there is no distinction between damages awarded as compensation for damage to property, as compensation for misrepresentation, or as compensation for emotional distress. Given that the jury was erroneously permitted to consider the Whaleys' claim for emotional distress, a component of the award of damages against the Appellants may well have been for emotional distress, but the jury verdict form leaves us with no way to know whether this is the case, and if so, what proportion of the damages were awarded for emotional distress. Therefore, judgment on the jury verdict must be vacated.

As to the alleged inconsistency and excessiveness of the jury verdict, we pretermit these issues in light of our conclusion that the judgment must be vacated.

## VI. CONCLUSION

For all the foregoing reasons, we vacate the judgment on the jury verdict. We remand the case to the trial court for the direction of a verdict for the defendant, Jim Ann Perkins, and for a new trial as to the other defendants consistent with this Opinion. Costs in this appeal are to be assessed one-half to Appellants, Albert Lewis Beshires and Terry Lynn Beshires, and their surety, and one-half to the Appellees, Forrest L. Whaley and Margaret Ann Whaley.

_____
W. FRANK CRAWFORD, PRESIDING JUDGE, W.S.